**GUITAR APPRENTICE, INC., Plaintiff,**

v.

**UBISOFT, INC., Defendant.**

**No. 2:13–cv–02903–JPM–tmp.**

United States District Court, W.D. Tennessee, Western Division.

Signed Feb. 26, 2015.

John Francis Triggs, Ryan Daniel Levy, Patterson Intellectual Property Law. P.C., Nashville, TN, Amy Pepke, Butler Snow LLP, Memphis, TN, for Plaintiff.

Douglas F. Halijan, Shea B. Oliver, Burch Porter & Johnson, Memphis, TN, Eric Buresh, Michelle Marriott, Mark Lang, Erise Ip, P.A., Overland Park, KS, for Defendant.

## ORDER FOLLOWING CLAIM CONSTRUCTION HEARING

JON P. McCALLA, District Judge.

Before the Court is the parties' request for claim construction pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) (en banc).

## I. BACKGROUND

### A. Factual Background

Plaintiff Guitar Apprentice, Inc. ("Guitar Apprentice") is a Delaware corporation with its principal place of business in Tennessee. (Compl. ¶ 1.) Defendant Ubisoft, Inc. ("Ubisoft") is a California corporation with its principal place of business in California. (*Id.* at ¶ 2.) This case involves the

alleged infringement of United States Patent Number 8,586,849 (the "'849 patent"). (*Id.* at ¶ 16.) Guitar Apprentice owns the '849 patent and alleges that Ubisoft advertises and distributes products that infringe the '849 patent. (*Id.* at ¶¶ 16, 19.)

### B. Procedural History

Guitar Apprentice filed its complaint against Ubisoft on November 19, 2013, alleging that Ubisoft's products infringed Guitar Apprentice's '849 patent. (ECF No. 1.) On January 15, 2014, Ubisoft filed its answer. (ECF No. 8.)

On April 17, 2014, the Court held a Patent Scheduling Conference, during which the parties presented the technology. (ECF No. 22.)

On July 15, 2014, Ubisoft filed its First Amended Answer to Guitar Apprentice's Complaint and Counterclaim to add a counterclaim that the '849 patent is unenforceable. (ECF No. 27.) On July 29, 2014, Guitar Apprentice filed its answer to Ubisoft's counterclaim. (ECF No. 30.)

On July 28, 2014, the parties filed their respective Opening Claim Construction Briefs. (ECF Nos. 28, 29.) On August 27, 2014, the parties filed their respective Responsive Claim Construction Briefs. (ECF Nos. 31, 32.) The Court held a claim construction hearing on October 21, 2014. (ECF No. 44.)

On November 6, 2014, Ubisoft filed its Supplemental Claim Construction Brief, citing a recent decision by the United States Court of Appeals for the Federal Circuit ("the Federal Circuit") in the case of *Robert Bosch, LLC v. Snap–On, Inc.,* 769 F.3d 1094 (Fed.Cir.2014). (ECF No. 48.) On the same day, Guitar Apprentice filed its own Supplemental Claim Construction Brief, arguing that the *Bosch* decision was distinguishable on its facts and that the Federal Circuit's recent decision in *Williamson v. Citrix Online, LLC,* 770 F.3d 1371 (Fed.Cir.2014) governed this

Court's construction of some of the disputed claims in the '849 patent. (ECF No. 50.) Both parties filed a response to the other's Supplemental Claim Construction Brief on November 13, 2014. (ECF Nos. 51, 52.)

## II. CLAIM CONSTRUCTION STANDARD

"In conducting an infringement analysis, a court must first determine the meaning of any disputed claim terms and then compare the accused device to the claims as construed." *Proveris Scientific Corp. v. Innovasystems, Inc.,* 739 F.3d 1367, 1371–72 (Fed.Cir.2014) (citing *Wavetronix LLC v. EIS Elec. Integrated Sys.,* 573 F.3d 1343, 1354 (Fed.Cir.2009)); *accord Markman,* 52 F.3d at 976. Regarding the first step, claim construction is a question of law with "evidentiary underpinnings" to be determined by the court. *Teva Pharm. USA, Inc. v. Sandoz, Inc.,* —— U.S. ——, 135 S.Ct. 831, 835, 837, —— L.Ed.2d —— (2015); *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 390, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Where terms or phrases are "not commonly understood," a court may make subsidiary findings of fact based on evidence extrinsic to the patent to assist the court in its task of claim interpretation. *See Teva Pharmaceuticals,* 135 S.Ct. at 837–38. These factual determinations precede the court's ultimate legal construction of the patent's claims. *Id.*

### A. Claims

#### 1. General construction

Claim construction begins with the language of the claims themselves. *Braintree Labs., Inc. v. Novel Labs., Inc.,* 749 F.3d 1349, 1354–55 (Fed.Cir.2014) (citing *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331 (Fed.Cir. 2001)). Claim terms in the patent "are

generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art" at the time the patent was filed. *CardSoft v. Verifone, Inc.*, 769 F.3d 1114, 1117 (Fed.Cir.2014); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed.Cir.2005). This general rule has two known exceptions: (1) "when a patentee sets out a definition and acts as his own lexicographer," or (2) "when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed.Cir.2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed.Cir.2012)). Where a claim term has more than one "ordinary" meaning, or when reliance on a term's "ordinary" meaning does not resolve the parties' dispute, a determination that a claim term "needs no construction" or has the "plain and ordinary meaning" may be inadequate. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed.Cir.2008).

■ "To determine the scope and meaning of a claim, we examine the claim language, written description, prosecution history, and any relevant extrinsic evidence." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1339 (Fed. Cir.2014) (citing *Phillips*, 415 F.3d at 1315–19); *Markman*, 52 F.3d at 978–79.

> Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term. And while the prosecution history often lacks the clarity of the specification, it is another established source of intrinsic evidence. After considering these three sources of intrinsic evidence, a court may also seek guidance from extrinsic evidence. However, extrinsic evidence may be less reliable than the intrinsic evidence.

*Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed.Cir.2014) (citations and internal quotation marks omitted).

■ Regarding the relationship of dependent claims to independent claims, there is a presumption under the doctrine of claim differentiation that limitations found in dependent claims are not included in the independent claim. *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed.Cir.2014); *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed.Cir.2004). Claim differentiation, however, "is not a hard and fast rule, and the presumption can be overcome by a contrary construction required by the specification or prosecution history, such as via a disclaimer." *Id.*

### 2. Means-plus-function claim limitations

■ Section 112 of the Patent Act provides that claim limitations may be expressed as "means-plus-function" limitations:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f). The Federal Circuit has established two guidelines for determining whether § 112(f) applies to a given claim limitation. First, "use of the word 'means' creates a rebuttable presumption that the drafter intended to invoke [§ 112(f)], while failure to use the word 'means' creates a rebuttable presumption that the drafter did not intend the claims to be governed by [§ 112(f)]." *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1373 (Fed.Cir.2012) (citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703–04 (Fed.

Cir.1998)). "[This] presumption[ ] can be rebutted if the evidence intrinsic to the patent and any relevant extrinsic evidence so warrant." *Personalized Media,* 161 F.3d at 704.

■ Second, if the patentee omits the term "means" from the claim, there is a rebuttable presumption that § 112(f) does not apply. *Id.* at 703. The presumption that § 112(f) does not apply because of the failure to use the word "means" "may be overcome if the claim fails to recite 'sufficiently definite structure' or merely recites a 'function without reciting sufficient structure for performing that function.'" *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1297 (Fed.Cir.2014) (quoting *Linear Tech. Corp. v. Impala Linear Corp.,* 379 F.3d 1311, 1319 (Fed.Cir.2004)). The Federal Circuit has "repeatedly characterized this presumption as 'strong' and 'not readily overcome' and, as such, [has] 'seldom' held that a limitation without recitation of 'means' is a means-plus-function limitation." *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1358, 1362 (Fed.Cir.2004); *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.,* 649 F.3d 1350, 1356 (Fed.Cir.2011)).

■ "The correct inquiry is 'whether skilled artisans, after reading the patent, would conclude that a claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming.'" *EnOcean GmbH v. Face Int'l Corp.,* 742 F.3d 955, 958 (Fed.Cir. 2014) (quoting *Inventio,* 649 F.3d at 1357 (Fed.Cir.2011)).

The overall means-plus-function analysis is a two-step process. Naturally, there is some analytical overlap between these two steps. In the first step, we must determine if the claim limitation is drafted in means-plus-function format. As part of this step, we must construe the claim limitation to decide if it connotes "sufficiently definite structure" to a person of ordinary skill in the art, which requires us to consider the specification (among other evidence). In the second step, if the limitation is in means-plus-function format, we must specifically review the specification for "corresponding structure." Thus, while these two "structure" inquiries are inherently related, they are distinct.

*Apple,* 757 F.3d at 1296.

**B. Intrinsic Record**

**1. Specification**

■ "The specification is fundamental to claim construction, as it is the single best guide to the meaning of a disputed term." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC,* 728 F.3d 1309, 1319 (Fed.Cir. 2013) (quoting *Phillips,* 415 F.3d at 1315) (internal quotation marks omitted). In determining the meaning to be given to claim terms, a court must read the terms in the context of the specification as it is the patent specification which, by statute, must contain a "full, clear, concise, and exact" description of the invention. 35 U.S.C. § 112(a); *accord Phillips,* 415 F.3d at 1311. Consequently, "claim terms must be construed in light of the specification and prosecution history, and cannot be considered in isolation." *GE Lighting Solutions,* 750 F.3d at 1308–09 (citing *Phillips,* 415 F.3d at 1313).

■ Although claim terms are normally given their ordinary and customary meaning, a patentee may depart from this rule by acting as his own lexicographer or by disavowing the claim scope in the specification. *Azure Networks, LLC v. CSR PLC,* 771 F.3d 1336, 1347–48 (Fed.Cir. 2014) (citing *Phillips,* 415 F.3d at 1316). "Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification." *3M Innovative Props. Co. v. Tredegar Corp.,* 725 F.3d 1315, 1321 (Fed. Cir.2013) (citing *Phillips,* 415 F.3d at 1315–16). To use a special definition of a

claim term, the patentee must "clearly" redefine the term and have an "express intent" to do so within the patent. *Thorner*, 669 F.3d at 1365–66; *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed.Cir.2000).

 Courts, however, "do not read limitations from the embodiments in the specification into the claims." *Hill–Rom*, 755 F.3d at 1371 (citing *Liebel–Flarsheim*, 358 F.3d at 904). This requirement prevents a court from limiting the scope of the claims to only the preferred embodiment or specific examples disclosed in the specification. *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed.Cir.2014) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." (quoting *Liebel–Flarsheim*, 358 F.3d at 913)).

### 2. Prosecution History

 "A court should also consider the patent's prosecution history, if it is in evidence. The prosecution history consists of the complete record of the proceedings before the [U.S. Patent and Trademark Office]." *InTouch Techs.*, 751 F.3d at 1341 (citations and internal quotation marks omitted). "[P]rosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed.Cir.2013) (alteration in original) (quoting *Phillips*, 415 F.3d at 1317) (internal quotation marks omitted). A court "does not rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be un-

less a patentee limited or surrendered claim scope through a clear and unmistakable disavowal." *3M*, 725 F.3d at 1322 (citing *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed.Cir.2010)).

### C. Extrinsic Evidence

 "Although it is less significant than intrinsic evidence, a court can consider extrinsic evidence in the record, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1355 (Fed.Cir.2013) (quoting *Phillips*, 415 F.3d at 1317). Although such evidence is generally considered less reliable than the intrinsic record, a court is free to consider it and may do so at any stage of its inquiry. *Phillips*, 415 F.3d at 1318–19. A court may rely on extrinsic evidence so long as the evidence does not contradict the intrinsic record. *Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374–75 (Fed. Cir.2012) (citing *Phillips*, 415 F.3d at 1319).

### III. ANALYSIS OF THE '849 PATENT

The '849 patent relates to a "media system and method of progressive instruction in the playing of a guitar based on user proficiency." ('849 patent at 1.)

### A. The Disputed Claims

The parties disagree about the proper construction of several claim terms found in the '849 patent. The independent claims containing the disputed language are as follows, with the dependent claims referenced and the contested language underlined:

### 1. Claim 1

Claim 1 is the first independent claim of the '849 patent, on which asserted claims 2, 5, and 6 depend.

1. A media system for progressive instruction in the playing of a guitar, the system comprising:

a non-transitory processor-readable memory medium having software residing thereon, the software executable by a processor to direct the performance of generating audio signals corresponding to prerecorded sounds from one or more musical instruments associated with a *predetermined musical performance,* the one or more musical instruments comprising a guitar, the *predetermined musical performance* comprising a plurality of musical segments each further comprising one or more guitar notes or chords;

for a particular *iteration* of the musical performance, defining one or more of the plurality of musical segments as one or more user segments each having one or more associated display images comprising graphical representations of which one or more guitar strings to be engaged, and on which frets, to play the one or more notes or chords corresponding to the user segment;

sequentially generating the display images in association with the user segments of the musical performance;

during each user segment of the musical performance, prompting the user to play the corresponding one or more notes or chords; and

in association with subsequent *iterations* of the musical performance, defining one or more of the associated musical segments as one or more user segments based on criteria comprising a proficiency level of the user, wherein the proficiency level of the user is determinable by the system in accordance with signals received electrically from a guitar played by the user in relation to the display images generated during the one or more user segments associated with a previous *iteration* of the performance.

('849 patent, col. 9, ll. 8–41, ECF No. 1–2 at PageID 30.)

### 2. Claim 9

Claim 9 is the second independent claim of the '849 patent, on which· asserted claims 10, 14, 15, and 16 depend:

9. A media system for progressive musical instruction in the playing of a guitar, the media system comprising:

a display device;

a processor operatively coupled to the display device; and

a non-transitory processor-readable memory medium having program modules embodied thereon, said program modules executable by the processor and further comprising

a data storage module effective to store one or more musical performances, each performance further comprising a plurality of musical segments each having one or more corresponding guitar notes or chords, the musical segments further comprising one or more user segments each having one or more associated display images for prompting a user to play the one or more corresponding notes or chords;

an audio control module effective to generate prerecorded sounds corresponding to one or more musical instruments associated with a selected musical performance, said musical instruments at least comprising a guitar;

a display control module effective to generate upon the display device a first graphical representation of a guitar fret board and during user segments of the selected musical performance to populate the first graphi-

cal representation with the one or more display images associated with the user segments, each display image comprising one or more instruction tools associated with playing one or more guitar notes or chords in accordance with the musical performance;

a *proficiency sensing module* effective to receive signals from a guitar electrically coupled to the system, compare the received signals to expected signals associated with corresponding user segments of the musical performance, and determine a proficiency level of the user based on the comparison; and

a *mode control module* effective to define one or more of the plurality of musical segments in the selected performance as user segments *based upon one or more criteria including the determined proficiency level of the user and a performance iteration,* wherein in successive *iterations* the *mode control module* determines whether the proficiency level of the user warrants increasing the number of user segments.

(*Id.* col. 10, ll. 11–53.)

### 3. Claim 17

Claim 17 is the third independent claim in the '849 patent, on which asserted claims 18 and 20 depend:

17. A method of progressive instruction in the playing of a guitar by a media system storing one or more *predetermined musical performances* each further comprising a plurality of musical segments having associated guitar notes or chords, the method comprising the steps of:

(a) defining one or more of said musical segments as one or more user segments for a first *iteration* of a selected musical performance from the one or more *predetermined musical per-*

*formances* stored in the media system, said one or more user segments each having one or more associated display images for prompting a user to play the corresponding notes or chords;

(b) generating audio signals effective to simulate sounds for one or more musical instruments associated with the selected musical performance;

(c) for each of said one or more defined user segments, generating the one or more display images to graphically demonstrate a preferred user operation of a guitar corresponding to the selected musical performance;

(d) identifying a proficiency level of the userbased on input signals received from a guitar electrically coupled to the media system in relation to the display images generated during the one or more defined user segments;

(e) determining a number of user segments for a successive *iteration* of the selected musical performance based on criteria comprising the proficiency level of the user, wherein the determining step in accordance with a first proficiency level comprises maintaining the number of user segments in a successive *iteration* of the selected musical performance, further wherein the determining step in accordance with a second proficiency level comprises adding one or more musical segments of the selected musical performance to the one or more user segments in a successive *iteration* of the selected musical performance; and

(f) repeating steps (b) to (e) in accordance With said successive *iteration* of the selected musical performance.

(*Id.* col. 11, l. –30 col. 12, l. 25.)

### B. Claim Limitation Agreed Upon by the Parties

The parties agree that the claim limitation "musical performance" should be con-

strued as "complete or entire song." (ECF No. 28 at 5; ECF No. 29 at 7.) The Court acknowledges this construction, as it may provide useful and relevant context. Accordingly, the Court adopts the construction of "musical performance" to mean "complete or entire song."

## C. The Disputed Claim Limitations

### 1. The "predetermined musical performance" Limitation

■ Ubisoft argues that the proper construction of "predetermined musical performance" is "musical performance(s) stored in advance." (ECF No. 28 at 6.) Ubisoft asserts that the parties have already agreed on the meaning of "musical performance" as a "complete or entire song." (*Id.*) According to Ubisoft the dispute is over the meaning of "predetermined." (*Id.*) Ubisoft argues that that the meaning of "predetermined" must include the limitation that the musical performance was "stored." (*Id.*) Ubisoft asserts, "Claim 17 expressly requires the concept of storage in advance, given that the preamble recites a 'media system storing one or more predetermined musical performances....'" (*Id.* at 6–7 (citing '849 patent col. 11, ll. 31–32.) (emphasis omitted).) Additionally, Ubisoft asserts that dependent claim 5 requires storage in advance when it states that "the 'predetermined musical performance' can be 'selectable by the user from among a plurality of musical performances associated with the memory medium.'" (*Id.* at 7 (citing '849 patent col. 9, ll. 61–63) (emphasis omitted).)

Ubisoft also argues that the specification supports the conclusion that "predetermined" is limited to storage in advance. (*Id.*) According to Ubisoft, "the media system includes a memory medium 'upon which one or more musical performances 28 or songs 28 may be stored.'" (*Id.* at 7 (citing '849 patent col. 4, ll. 4–5.) (emphasis

omitted).) Ubisoft further cites to the '849 patent specification, which states in relevant part, "An initial set 32 for use in a particular session ... may be predetermined as stored within the system 10 ..." (*Id.* (quoting '849 patent col. 4, ll. 34–36).)

Guitar Apprentice contends that the proper construction of "predetermined musical performance" is "a predetermined complete or entire song." (ECF No. 29 at 8.) Guitar Apprentice argues that this construction is consistent with the plain and ordinary meaning of "predetermined musical performance" and consistent with its use throughout the '849 patent. (*Id.* at 11.) Guitar Apprentice asserts that the limitation "stored in advance" does not exist in independent claim 1 and that to include such a limitation would be to "to impermissibly extract limitations from the specification...." (ECF No. 29 at 9.) Additionally, Guitar Apprentice argues that reading the limitation "stored in advance" into the claims "violate[s] the well-settled canon of claim differentiation" because "the term 'stored' in Claim 17 would be rendered superfluous by incorporation [of stored in advance] into the term 'predetermined' as further recited in Claim 1...." (*Id.* at 10–11.) Guitar Apprentice also points out that the term "predetermined" is used with other terms throughout the '849 patent, and those usages do not require or imply "storage." (*Id.* at 11.)

Finally, Guitar Apprentice quotes two dictionary definitions of "predetermined" in support of its position. The first defines "predetermine" as "settle or decide in advance." (ECF No. 29 at 9 (citing Random House Webster's Unabridged Dictionary, Second Edition, 1998 at p. 1522).) The second provides the definition, "to determine, decide or establish ahead of time." (*Id.* (citing Webster's II New College Dictionary, 2001 at p. 870).)

The Court first looks to the claims themselves and construes claim limitations therein as having their plain and ordinary meaning absent indication of a contrary meaning in the specification or prosecution history. *See 3M*, 725 F.3d 1315, 1321 (Fed.Cir.2013); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996). Claim 1 of the '849 patent is the broadest independent claim and does not expressly disclose storage of the "predetermined musical performance." Nor does claim 1 associate "predetermined musical performance" with any memory medium. Instead, claim 1 is explicit that the "non-transitory processor-readable memory medium" contains software "to direct the performance of generating audio signals corresponding to prerecorded sounds from one or more musical instruments associated with a predetermined musical performance ...." ('849 patent col. 9, ll. 12–15.) Therefore, claim 1 only discloses that the software that executes the invention is associated with the medium memory. Accordingly, a plain reading of claim 1 does not indicate a departure from the plain and ordinary meaning of "predetermined musical performance."

██ Claims 5 and 17 also use the claim limitation "predetermined musical performance." ('849 patent col. 9, ll. 61–63, col. 11, l. 30—col. 12, l. 26.) Guitar Apprentice argues that the doctrine of claim differentiation applies between claim 1 and claims 5 and 17. Claim differentiation typically applies where a limitation exists in a dependent claim, such that application of the limitation to an independent claim would render the limitation in the dependent claim redundant. *See Curtiss–Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed.Cir.2006); *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed.Cir.2005). Claim differentiation may also apply to two independent claims. *See Curtiss–Wright*, 438 F.3d at 1380.

[T]wo considerations generally govern [claim differentiation] when applied to two independent claims: (1) claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous; and (2) claim differentiation "can not broaden claims beyond their correct scope."

*Id.* at 1381 (quoting *Fantasy Sports Props. v. Sportsline.com*, 287 F.3d 1108, 1115–16 (Fed.Cir.2002)).

In the instant case, both types of claim differentiation apply. Claim 5 is dependent on claim 1. Claim 5 discloses two limitations related to the term "predetermined musical performance" not previously disclosed in claim 1. The first limitation is that the "predetermined musical performance" is "selectable by the user from among a plurality of musical performances ...." ('849 patent col. 9, ll. 61–63.) The second limitation is that the "predetermined musical performance" is "associated with the memory medium." (*Id.*) Consequently, claim differentiation, as applied between claims 1 and 5, suggests that the limitation "associated with the memory medium" should not limit the scope of "predetermined musical performance" in claim 1.

Claim 17 is an independent method claim. Claim 17 recites in relevant part "one or more predetermined musical performances stored in the media system...." (*Id.* col. 11, ll. 37–39.) First, claim differentiation is relevant because substituting Ubisoft's proposed construction "musical performances stored in advance" for "predetermined musical performances" would result in a reading of the claim as "musical performances stored in advance stored in the media system...." This substitution renders Ubi-

soft's proposed language "stored in advance" superfluous.

Second, applying claim differentiation under these circumstances would not broaden the scope of the invention. As discussed, the language in claim 1 does not require that the "predetermined musical performance" be stored in advance. Moreover, claim differentiation as applied to claims 1 and 5 supports the contrary conclusion that limiting the term "predetermined musical performance" as being associated with a memory medium is inappropriate. Accordingly, the Court finds that application of claim differentiation to claims 1 and 17 is appropriate; and further, that claim differentiation supports the conclusion that "predetermined musical performance" should not be construed with the limitation "stored in advance."

The conclusion that "predetermined musical performance" is not limited as "stored in advance" is further supported by the '849 patent specification. Although Ubisoft correctly cites to several passages in the '849 patent specification where the musical performances are stored on the memory medium, these passages merely refer to certain narrow embodiments of the invention. Where the specification discloses an embodiment narrower than the scope of invention contemplated by the claims, it is improper to read those limitations onto the claimed invention. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed.Cir. 2007) ("Although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." (internal quotation marks and citations omitted)). Contrary to Ubisoft's position, nothing in the specification indicates that musical performances must always be stored on the memory medium. As discussed, the claims indicate a broader invention than one where musical performances are necessarily stored on a memory

medium. For example, in describing Figures 1–15, the '849 patent specification teaches that "a media system in accordance with the present disclosure instructs a user with regards to one or more portions of a predetermined musical performance, and plays the remaining portions of the performance." ('849 patent col. 2, ll. 62–65.) In this section, the specification does not impose any requirement that the "predetermined musical performance" be stored in advance. Later on, the specification confirms the language in claim 1 that the software, rather than the musical performance, must be associated with the memory medium. (*Id.* col. 3, ll. 12–16, 28–31 ("[V]arious embodiments of media systems 10 as disclosed herein include a processor-readable memory medium 12 or various memory media 12 having a computer program module 22 with processor readable instructions embodied therein.... When the memory medium 12 is operatively coupled to a processor 14 the instructions may be executed by the processor 14 to perform various functions....").) Thus, on the balance, the specification leaves open the possibility that a "predetermined musical performance" is not "stored in advance." Accordingly, the Court finds that it would be improper to read the limitation "stored in advance" onto the claim limitation "predetermined musical performance." The Court adopts Guitar Apprentice's construction "a predetermined complete or entire song."

### 2. "Iteration"

■ Ubisoft argues that the proper construction for the term "iteration" is "determined set of non-user (i.e., host) and user segments." (ECF No. 28 at 8.) According to Ubisoft, "[a]ll of the asserted claims refer to an 'iteration' of a musical performance." (*Id.*) Ubisoft characterizes "iteration" as a "foundational concept,"

where all of the host segments and user segments "are first determined, and the entire musical performance is then heard and experienced by the user." (*Id.*) Ubisoft cites to Figure 15 of the '849 patent as evidence that a new allocation of user and host segments is determined only after the song is complete. (*Id.* at 9.) Ubisoft concludes that "[a]t no point does the disclosure of the '849 patent contemplate that the allocation of user or host segments changes dynamically throughout the musical performance, and the express language of the claims forbids such an interpretation." (*Id.*)

Guitar Apprentice argues that "iteration" "is clearly understood on its face and requires no additional analysis...." (ECF No. 29 at 12.) Guitar Apprentice asserts that "the addition of references to the segments [in the construction] adds nothing to clarify this term that is not already present in the claim language itself." (*Id.*) Instead, Guitar Apprentice argues, "iteration" as used in the context of the '849 patent claims and specification, refers to an initial "instance and subsequent (or successive) repetitions of a musical performance." (ECF No. 29 at 12.)

Guitar Apprentice further contends that the term "non-user segments" is inappropriate given the prosecution history of the '849 patent. According to Guitar Apprentice, the term "host segments" was removed from the '849 patent claims in response to the PTO's rejection of the patent application for indefiniteness. (*Id.* at 13.)

The term "iteration" is used throughout the '849 patent claims and specification. The term "iteration" is used several times in claim 1, including "a particular iteration of the musical performance," "association with subsequent iterations of the musical performance," and "associated with a previous iteration of the performance." ('849 patent col. 9, ll. 20, 3233, 40–41.) In claim 9, "iteration" is used in the phrase "based upon one or more criteria including the determined proficiency level of the user and a performance iteration, wherein in successive iterations[,] the mode control module determines whether the proficiency level of the user warrants increasing the number of user segments." (*Id.* col. 10, ll. 4853.) Claim 17 uses "iteration" in the phrase "first iteration of a selected musical performance," and again in the phrase "successive iteration of the selected musical performance." (*Id.* col. 11, ll. 36–37, col. 12, ll. 12–13.) Each use of the term "iteration" in the '849 patent claims is in conjunction with either "performance" or "musical performance." The parties have already stipulated that "musical performance" is defined as "complete or entire song." (ECF No. 28 at 5; ECF No. 29 at 7.) Consequently, the claim language surrounding "iteration" throughout the '849 patent claims suggests that iteration refers to completion of an entire song. Because, however, the parties have not stipulated that the meaning of "performance" is also "a complete or entire song," the Court cannot conclude based on the claim language alone that "iteration" is limited to the completion of an entire song. Accordingly, the Court looks to the specification for further evidence of the meaning of "iteration."

"Iteration" is used numerous times throughout the '849 patent specification. Similar to the patent claims, the term is generally used in the specification in connection with "musical performance" or "performance." In describing the Figure 15 flowchart, the '849 patent specification explains, "If the musical performance has completed, the method 100 continues to step 114 and determines whether the *next iteration of the musical performance* will maintain the same allocation of segments between the host and the user." ('849 patent col. 8, ll. 32–35 (emphasis added).) The '849 patent Abstract also uses "itera-

tion" in connection with the term "performance."

Importantly, though, "iteration" is used in an alternative embodiment separate and independent from the terms "performance" or "musical performance." In this embodiment, the specification teaches that "the user segments in an initial set or iteration to be played would generally be determined with respect to a relatively low difficulty level and gradually increased in successive sets or iterations." (*Id.* col. 4, ll. 42–45.) This embodiment envisions an invention where the level of difficulty increases with successive sets of user segments, not just successive iterations of the entire song. Thus, Ubisoft's contention that the '849 patent does not "contemplate that the allocation of user or host segments changes dynamically throughout the musical performance," is belied by the explicit disclosure of this embodiment. Furthermore, because the term "set" is not used expressly in the '849 patent claims, the Court is persuaded that a narrow construction of the term "iteration" would be in error. Instead, the Court must construe "iteration" in light of the entire specification and the invention disclosed therein. *See GE Lighting Solutions,* 750 F.3d at 1308–09. Accordingly, the Court finds that the scope of the term "iteration" is not limited to a complete or entire song.

Regarding inclusion of "non-user (i.e., host) and user segments" in the construction, the Court finds Guitar Apprentice's arguments persuasive. United States Patent Application No. 13/553,310 ("the 310 application") was rejected in part because the drafters had failed to disclose any subject matter for the term "host segments."[1] (ECF No. 29–4 at 57.) The drafter's response was to remove the term from the patent claims. (ECF No. 29–4 at 47.) To try and reintroduce the "host segments"

now would be improper given the subsequent acceptance of the claims and issuance of the '849 patent. Accordingly, the Court declines to interpret the term "iteration" beyond its plain and ordinary meaning.

### 3. The "based upon one or more criteria including the determined proficiency level of the user and a performance iteration" Limitation

Ubisoft argues that claim 9 is indefinite for "fail[ing] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." (ECF No. 28 at 10 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.,* —— U.S. ——, 134 S.Ct. 2120, 2124, 189 L.Ed.2d 37 (2014)).) Ubisoft argues that " 'performance iteration' is mentioned nowhere in the specification or prosecution history of the '849 patent." (*Id.* at 11.) Ubisoft further asserts that "both the determined proficiency level of the user and a performance iteration" must be present in order for the mode control module to define musical segments. (ECF No. 28 at 10.) This is true, Ubisoft asserts, because when the phrase "one or more" is combined with "and", the presence of every listed item is required. (*Id.* (citing *SuperGuide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 886 (Fed.Cir. 2004)).) Ubisoft also asserts that the specification fails to show how the stated criteria "define one or more of the plurality of musical segments." (ECF No. 28 at 11.) Therefore, Ubisoft concludes, "the function of claim 9 requires user segments to be defined based on, at least in part, a 'performance iteration.'" (Id. at 11.)

Guitar Apprentice argues that "[i]n the absence of any explicit disclaimer or other evidence requiring such a construction, the imposition of 'both' should be rejected, as

[1]. The PTO also found the term "user segments" to be indefinite. The drafters resolved this issue by adding content to the specification and further defining the term.

rendering the term 'one or more' utterly superfluous." (ECF No. 29 at 14.) Guitar Apprentice asserts that the proper construction of the term is "[b]ased upon one or more criteria, one criterion including the determined proficiency level of the user and another criterion including a particular iteration of a song." (*Id.* at 14.)

Guitar Apprentice further contends that this term is not indefinite. According to Guitar Apprentice, "the definiteness inquiry does not require 'absolute precision'" because "'[s]ome modicum of uncertainty ... is the price of ensuring the appropriate incentives for innovation.'" (*Id.* at 16 (quoting *Nautilus*, 134 S.Ct. at 2128–29).) Guitar Apprentice asserts that although the term "performance iteration" is not explicitly recited in the '849 patent specification, the surrounding claim language makes clear that "'a performance iteration' is an iteration of the musical performance, as is explicitly recited in the claim." (*Id.* at 17.) Guitar Apprentice goes on to cite to several instances in the '849 patent specification where the number of user segments in a performance "may be increased with successive *iterations of the performance*." (*Id.* (emphasis added).)

▮ The Court agrees with Guitar Apprentice. The Court rejects Ubisoft's argument that both determined proficiency level of the user and a performance iteration are required in order for the system to define user segments. In *SuperGuide,* the Court of Appeals construed the phrase "at least one of" as it applied to different lists of criteria; for example, "first means for storing *at least one* of a desired program start time, a desired program end time, a desired program service, and a desired program type...." 358 F.3d at 884–85. Similar to the present case, the parties in *SuperGuide* disputed whether the list of criteria was conjunctive such that the phrase "at least one of" applied to each type of criteria in the list or whether

"'at least one of' refer[red] only to one category of the criteria...." *See id.* The Court of Appeals explained that "'an article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term.'" *Id.* at 886 (quoting William Strunk, Jr. & E.B. White, *The Elements of Style* 27 (4th ed.2000)). The Court of Appeals provided the example "in spring, summer, or winter means in spring, in summer, or in winter." *Id.* (internal quotation marks and citations omitted).

The Court of Appeals found that the lists were conjunctive and that at "least one of" applied to each criteria in the list. *Id.* The Court of Appeals found persuasive the fact that the drafter used "and" at the end of each list rather than "or." *Id.* The Court of Appeals also noted that the district court had based its construction, which was affirmed by the Court of Appeals, on the fact that the phrase "a desired." "is repeated for each category and because the final category in the criteria list is introduced by 'and a desired....'" *Id.* at 885 (citing *SuperGuide Corp. v. DirecTV Enterprises, Inc.,* 169 F.Supp.2d 492, 517 (W.D.N.C.2001)). The Court of Appeals further concluded that "nothing in the specification rebuts the presumption that the [ ] patentee intended the plain and ordinary meaning of this language." *Id.* at 887.

The Court recognizes that similar to the claim limitation in *SuperGuide,* the patentee chose to use the term "and" in the claim limitation "based upon one or more criteria including the determined proficiency level of the user *and* a performance iteration." Further, the patentee did not expressly state that "and" should be interpreted as "or." *See SuperGuide,* 358 F.3d at 885–86. The claim limitation to be construed in the instant case, however, differs

in several respects from the lists associated with "at least one of" in *SuperGuide*. First, unlike the lists of criteria associated with "at least one of" in SuperGuide, there is no common modifier associated with the terms "the determined proficiency level of the user" and "a performance iteration."

Second, unlike the phrase "at least one of," which was followed directly by the list of categories of criteria, the phrase "one or more" is followed directly by the term "criteria." Consequently, the phrase "one or more" as used in the claim limitation "based upon *one or more criteria* including the determined proficiency level of the user and a performance iteration" is associated with the single term "criteria," and is not directly associated with successive categories of criteria. Thus, a plain reading of the claim limitation suggests that the phrase "one or more" does not apply to a conjunctive list of criteria, but rather, applies to criteria generally.

Third, even if the phrase "one or more" applied directly to the criteria listed, a conjunctive interpretation would be contradicted by a grammatically sound reading of the first set of criteria "the determined proficiency level of the user." The patentee's use of the definite article "the" and the singular form of "level" in the instant case suggests that the phrase "the determined proficiency level of the user" refers only to a single definite level determined by the system. *See The Chicago Manual of Style* § 5.69 (16th ed.2010). It is axiomatic, then, that if "the determined proficiency level of the user" refers to a single level, it cannot refer to a set of more than a single level. Consequently, construing the claim limitation as a conjunctive list would render the phrase "or more" superfluous in violation of well-known canons of construction.

Fourth, a conjunctive construction of the claim limitation at issue is also contradicted by both the surrounding claim language and the '849 patent specification. The '849 patent Abstract itself does not require or even mention the "performance iteration" criterion. Rather, the Abstract teaches that "[a] proficiency level of the user is [ ] identified, and a number of user and host segments [are] determined for a successive iteration of the performance based on at least the identified proficiency level of the user."

Further, the '849 patent specification summarizes the invention, "whereby a user learns to play a guitar by playing a gradually increasing number of segments (e.g., notes or chords) within a musical performance, as provided by the system *in accordance with a determined user proficiency*." ('849 patent col. 1, ll. 44–47 (emphasis added).) Additionally, the '849 patent specification describes the criteria used to determine "[t]he portions of the performance which are required of the user" in the disjunctive. (*Id.* col. 2, l. 65—col. 3, l. 1 ("The portions of the performance which are required of the user may be increased in length for example with successive iterations of the performance, or in accordance with successive proficiency levels.").)

Moreover, in one embodiment, the '849 patent specification teaches that an initial set of user segments "may be made selectable by a user, may be predetermined as stored within the system 10, or alternatively may be determined by the system 10 in accordance with various criteria." (*Id.* col. 4, ll. 34–37.) In this passage, the specification lists multiple ways user segments are defined where the system does not consider a "performance iteration." Even where the user segments are determined by the system, the '849 patent teaches that for this embodiment of the invention, "the criteria to be used *may include any or all of the following without limitation:* the difficulty of the segments, the proficiency level

of the user (as selected by the user or as determined by the system), the type of musical instrument and the distinctiveness of the segments." (*Id.* col. 4, ll. 38–42 (emphasis added).) Not only does this disclosure express the list of criteria in a disjunctive form, but it also omits any reference to "performance iteration."

The specification also discloses another embodiment where at the beginning of a session "the musical segments are predetermined in accordance with the determined proficiency level," again omitting the "performance iteration" criterion. (*Id.* col. 7, ll. 3–5.) Accordingly, the Court finds that "one or more" does not apply to a conjunctive list criteria. Therefore, the Court declines to adopt Ubisoft's proposed construction where both of the criteria, the determined proficiency level of the user and a performance iteration, are required in order to define user segments.

 The Court further rejects Ubisoft's argument that "performance iteration" is indefinite because the term is not disclosed in the '849 patent specification. Although the precise term "performance iteration" is not found in the specification, the claim language and numerous embodiments in the specification would connote to a person of ordinary skill in the art that "performance iteration" refers to an iteration of the (musical) performance. (*See* '849 patent col. 2, l. 67, col. 3, ll. 61–62, col. 8, ll. 33–34, 45–46.) For example, the '849 patent specification discloses an embodiment where "[t]he portions of the performance which are required of the user may be increased in length for example with *successive iterations of the performance,* or in accordance with successive proficiency levels." ('849 patent col. 2, l. 65—col. 3, l. 1 (emphasis added).) The Abstract also describes "a number of user and host segments determined for *a successive iteration of the performance* based on at least the identified proficiency level of the user."

(*Id.* Abstract (emphasis added).) Accordingly, the Court finds that the phrases "iterations of the performance," "iterations of the musical performance," or similar terms, as used in the '849 patent specification, directly relate to the claim term "performance iteration." Accordingly, the Court finds that the claim limitation "based upon one or more criteria including the determined proficiency level of the user and a performance iteration" is not indefinite. The Court construes this limitation as "based upon one or more of the following criteria: the determined proficiency level of the user, or a performance iteration."

### D. Alleged Means–Plus–Function Terms

The parties dispute whether the terms "proficiency sensing module" and "mode control module" were drafted in means-plus-function format.

The framework under which [the Court] determines if a claim limitation invokes [§ 112(f)] is a two-step process. First, [the Court] must determine if the claim limitation is drafted in the means-plus-function format.... If [the Court] conclude[s] that a claim term invokes [§ 112(f)] [the Court] proceed[s] to the second step and attempt[s] to construe the disputed claim term by identifying the "corresponding structure, material, or acts described in the specification" to which the claim term will be limited. *Bosch,* 769 F.3d at 1097.

#### 1. The "proficiency sensing module" Limitation

The Court will first construe the claim limitation "proficiency sensing module."

##### a) Means–Plus–Function Format

 The Federal Circuit has instructed that "when a claim limitation lacks the term 'means,' it creates a rebut-

table presumption that Section 112, ¶ 6 does not apply." *Apple,* 757 F.3d at 1297. "[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Inventio,* 649 F.3d at 1356 (citing *Lighting World,* 382 F.3d at 1358). "To rebut this strong presumption, it must be demonstrated that skilled artisans, after reading the patent, would conclude that the claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming." *Williamson,* 770 F.3d at 1378 (internal citations and quotation marks omitted).

In undertaking this analysis, [the Court] ask[s] if the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6. *Inventio,* 649 F.3d at 1357. The question is whether the claim language names particular structures or, instead, refers only to a general category of whatever may perform specified functions. *See Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1536 (Fed.Cir.1991) ("[t]he recited structure tells only what the means-for-joining does, not what it is structurally").

*Bosch,* 769 F.3d at 1099. If the claim limitation "is used in common parlance or by persons of skill in the pertinent art to designate structure," § 112(f) does not apply. *Flo Healthcare Solutions, LLC v. Kappos,* 697 F.3d 1367, 1374 (Fed.Cir. 2012) (internal quotation marks and citations omitted). In sum, "the first step in the means-plus-function analysis requires [the Court] to determine whether the entire claim limitation at issue connotes sufficiently definite structure to a person of ordinary skill in the art." *Apple,* 757 F.3d at 1296 (internal quotation marks and citations omitted).

Ubisoft argues that the term "proficiency sensing module" should be construed as a means-plus-function term under 35 U.S.C. § 112(f). (ECF No. 28 at 15.)

Ubisoft asserts that "there is no more structure in a 'module' [as claimed in the '849 patent] than there is in a 'means.'" (*Id.* at 16.) In support of this argument, Ubisoft points to the '849 patent claims which claim "a proficiency sensing module effective to receive signals from a guitar electrically coupled to the system, compare the received signals to expected signals associated with corresponding user segments of the musical performance, and determine a proficiency level of the user based on the comparison...." (ECF No. 31 at 17 (quoting '849 patent col. 10, ll. 40–45).) According to Ubisoft, "There is no disclosure regarding how signals are compared, or how a proficiency level of the user is determined...." (ECF No. 31 at 17.)

In support of its position, Ubisoft also points to the '849 patent specification which states in relevant part that "'a person having ordinary skill in the art of software programming would conceive of numerous structural means for producing the same executable results.'" (*Id.* (quoting '849 patent col. 3, ll. 18–28).) According to Ubisoft, "no 'structural means' are ever described in the '849 patent specification ... and the specification goes so far as to state that a 'particular structure' is 'not required' and is expressly 'omitted' from the patent disclosure." (*Id.* at 17 (quoting Ex. F (Mr. Kitchen Dec. ¶¶ 41, 42, 57)).)

Furthermore, Ubisoft asserts that "the only evidence in the record—the unchallenged opinion of Ubisoft's expert, Garry Kitchen—demonstrates that one of ordinary skill in the art would not recognize structure even with the addition of the 'proficiency sensing' modifier." (*Id.* at 17.) According to Ubisoft, "there is no generally understood meaning of the term 'proficiency sensing module' in the industry or in a dictionary (technical or other-

wise)...." (*Id.*) "Here, Guitar Apprentice has not submitted any evidence—no technical dictionary definitions, no expert testimony—and none of its cited cases stand for the proposition that a 'module' in the software context has any independent meaning." (ECF No. 31 at 15.)

Guitar Apprentice argues that Ubisoft has failed to overcome the "strong presumption" that claim language which does not employ the term "means" falls outside the scope of § 112(f). (*See* ECF No. 29 at 19.) In support of this argument, Guitar Apprentice cites to several district court decisions where the term "module" or other software terms were found to connote sufficient structure to avoid means-plus-function claim construction. (ECF No. 29 at 19–20 (citing *Beneficial Innovations, Inc. v. Blockdot, Inc.,* 2010 WL 1441779, at *16 (E.D.Tex.2010); *Eolas Technologies, Inc. v. Adobe Systems, Inc.,* 810 F.Supp.2d 795, 810 (E.D.Tex.2011); *Clear With Computers, LLC v. Hyundai Motor America, Inc.,* 2011 WL 43454, at *10 (E.D.Tex. 2011); *JuxtaComm–Texas Software, LLC v. Axway, Inc.,* 6:10–CV–11, 2011 WL 6102057 (E.D.Tex. Dec. 7, 2011) *aff'd sub nom. JuxtaComm–Texas Software, LLC v. TIBCO Software, Inc.,* 532 Fed.Appx. 911 (Fed.Cir.2013); *Mirror Worlds, LLC v. Apple, Inc.,* 742 F.Supp.2d 875, 881 (E.D.Tex.2010); *Convolve, Inc. v. Dell, Inc.,* 2011 WL 31792, at *18 (E.D.Tex. 2011); *Affymetrix, Inc. v. Hyseq, Inc.,* 132 F.Supp.2d 1212, 1231–32 (N.D.Cal.2001)).) According to Guitar Apprentice, "The 'proficiency sensing module' limitation includes not only a structural software recitation but further a thorough description of what the software is 'effective' to do upon execution by the processor, providing sufficient descriptions of exactly what is claimed." (ECF No. 29 at 21–22.) Guitar Apprentice interprets the language "effective to" "receive signals," "compare the received signals," and "determine a proficiency level" as structural limitations, whereas Ubisoft interprets such language as being merely functional. (*See* ECF No. 29 at 22.)

Guitar Apprentice further argues that the term "proficiency sensing module" is a term recognized by one of ordinary skill in the art as connoting structure because the general term "program module" is defined in the specification as "tangibly embodied on a non-transitory computer-readable medium, [ ] executable by a processor, and should be considered as directly analogous if not interchangeable with respect to the terms 'software' and 'instructions.'" (ECF No. 29 at 23 (citing '849 patent col. 2, ll. 42–46, col. 3, ll. 12–31).) Guitar apprentice asserts that because there is "little doubt" that "proficiency sensing module" refers to software, the term "module" "conveys sufficient structural meaning to persons of ordinary skill in the art, and the presumption that § 112(f) does not apply is determinative." (ECF No. 29 at 23–24.)

Guitar Apprentice also argues that steps relevant to "proficiency sensing module" recited in the claims are by themselves sufficient to connote structure to avoid means-plus-function construction of the term. According to Guitar Apprentice, "if Ubisoft's burden were so easily overcome, its proposed construction would expansively result in every software patent claim being subject to analysis under § 112(f)." (ECF No. 29. at 19.)

In its supplemental briefing, Guitar Apprentice distinguishes the present case from the circumstances in *Bosch,* where the Federal Circuit applied § 112(f) to a claim term that lacked the word "means." According to Guitar Apprentice, the *Bosch* case is distinguishable because the term "module" was not at issue and the "device" at issue could have been either hardware or software. (ECF No. 50 at 3–4.)

Guitar Apprentice asserts that the more applicable case is *Williamson* where the

Federal Circuit found that the term "distribution learning control module" did not invoke § 112(f). (*See* ECF No. 50 at 5.) Guitar Apprentice argues that the term "module" is not a mere nonce word based on the dictionary definitions relied on in *Williamson,* which are similar to those provided by Ubisoft's expert Mr. Kitchen. (ECF No. 50 at 6–7.) Guitar Apprentice further asserts that similar structure to the adjectival modifiers and claimed interconnections and communications present in the *Williamson* case exists in the present case. (ECF No. 50 at 7–8.)

Guitar Apprentice analogizes this case to the Federal Circuit's decision in *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 711 F.3d 1348, 1365 (Fed.Cir.2013). According to Guitar Apprentice, in *Power Integrations,* the Court of Appeals found the term "soft start circuit" was not a means-plus-function term even though a "variety of structures can be used to provide the claimed function," and the primary function of the circuit was to compare signals. (*See* ECF No. 50 at 9.) Guitar Apprentice asserts that "proficiency sensing module" similarly connotes "a defined class of structures" to one of ordinary skilled in the art sufficient to avoid § 112(f). (*See* ECF No. 50 at 9–10.)

Ubisoft contends that although *Williamson* directly addressed the term "module," the more applicable decision to the present case is *Bosch.* (*See* ECF No. 51 at 3–4.) Ubisoft argues that "[t]he common thread between the Federal Circuit's most recent rulings in *Bosch* and *Williamson* is that whether a claim term invokes 112, ¶ 6 is a patent-specific determination." (ECF No. 51 at 3.) Ubisoft distinguishes the present case from *Williamson* on the basis that Ubisoft has presented expert testimony that the terms " 'proficiency sensing module' and 'mode control module' were not generally known to one of skill in the art and are not described in the '849 pat-

ent...." (ECF No. 51 at 4.) Ubisoft further asserts that unlike the patent in *Williamson,* "the '849 patent intentionally omits any discussion in the specification regarding the structure or intended 'results' of the 'module' limitations at issue." (ECF No. 51 at 4.)

In order to determine whether "proficiency sensing module" is a means-plus-function claim limitation, the Court looks first to the language of the '849 patent claims. Whether the claim language associated with the term "proficiency sensing module" provides sufficient structure turns in part on whether the claim language is purely functional. *See Bosch,* 769 F.3d at 1100 ("Because the '313 patent's disclosures of 'program recognition device' and 'program loading device' are solely functional, one of ordinary skill in the art could not find in the specification a definition of the terms as referring to a particular structure."). Independent claim 9 of the '849 patent discloses the "proficiency sensing module." Claim 9 teaches that the "proficiency sensing module" is "effective to" carry out the following activities: 1) "receive signals from a guitar electrically coupled to the system;" 2) "compare the received signals to expected signals associated with corresponding user segments of the musical performance;" and 3) "determine a proficiency level of the user based on the comparison ...." ('849 patent col. 10, ll. 40–45.) Consequently, the Court must decide whether these three activities add structure to the term "proficiency sensing module" or merely describe the module's function.

To "determine a proficiency level based on [a] comparison" is most certainly functional language. Whether the term "proficiency sensing module" is construed broadly or narrowly, the primary purpose of the "proficiency sensing module" is to determine a proficiency level. The '849 patent,

however, fails to disclose in any manner how the "proficiency sensing module" software makes a determination of the user's proficiency level. In this respect, the "proficiency sensing module" is merely a black box that receives input signals and opaquely fashions a proficiency level output. *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir.2009) ("[W]hat the patent calls the "access control manager" is simply an abstraction that describes the function of controlling access to course materials, which is performed by some undefined component of the system. The ACM is essentially a black box that performs a recited function. But how it does so is left undisclosed.") Moreover, merely stating that the "proficiency sensing module" compares received signals to expected signals does not add any structure to the term. Not only does the '849 patent fail to disclose how the signals are compared, but it also fails to disclose how the system determines an expected signal.

In *Bosch*, the Court of Appeals found that the term "program recognition device" fell within the ambit of § 112(f) despite not employing the term "means." Although the "program recognition device" connected to physical structure, i.e., the control unit of a motor vehicle, the Court of Appeals found that § 112(f) applied in part because the specification was "silent about how the 'program loading device' receives and processes signals . . . ." *Bosch*, 769 F.3d at 1100. Thus, mere connection to, and receipt of signals from, a structural entity does not provide sufficient structure to avoid means-plus-function claim construction. Like *Bosch*, the '849 patent neither explains how the signals are received from a guitar nor how those signals are processed by the module. Accordingly, the Court finds that the claim language regarding "proficiency sensing module" is functional and does not save the term from a means-plus-function analysis.

Having determined that the claim language is purely functional, the Court must consider the remaining intrinsic and extrinsic evidence to determine whether § 112(f) applies. In *Williamson*, the Court of Appeals found that a claim limitation which included the term "module" connoted sufficient structure to avoid a means-plus-function construction. 770 F.3d 1371. In reversing the district court's application of § 112(f) to the term "distributed learning control module," the Court of Appeals found

> the district court erred: (1) in failing to appreciate that the word "module" has a number of dictionary meanings with structural connotations; (2) in placing undue emphasis on the word "module" separate and apart from the claimed expression "distributed learning control module"; and (3) in failing to give proper weight to the surrounding context of the rest of the claim language and the supporting text of the specification in reaching the conclusion that the drafter employed means-plus-function claiming.

*Williamson*, 770 F.3d at 1379. Because the Court is to construe a potential means-plus-function claim limitation in consideration of "the remaining claim language, specification, prosecution history, and relevant external evidence" as a whole, *Apple*, 757 F.3d at 1300, and subsidiary factual findings based on extrinsic evidence are to be treated as questions of fact, *Teva Pharmaceuticals*, 135 S.Ct. at 841, the Court does not interpret *Williamson* as removing all claim limitations which include the term "module" from the scope of § 112(f) claim interpretation. Accordingly, the Court will evaluate the particular extrinsic and intrinsic evidence associated with the '849 patent to determine whether "proficiency sensing module" is to be construed as a means-plus-function term.

The Court finds that significant differences exist between the evidence assessed in *Williamson* and the evidence present in the instant case. With regard to intrinsic evidence, U.S. Patent No. 6,155,840 ("*Williamson* patent") provided substantially more structure than that disclosed by the '849 patent specification for the term "proficiency sensing module." For example, with regards to the term "distributed learning control module," (referred to in the *Williamson* patent as "DLCM") the *Williamson* patent specification disclosed

> [a] preferred embodiment of the DLCM 310 [which] executes an operating system like MICROSOFT WINDOWS NT® or SUN MICROSYSTEMS SOLARIS® 2.x and uses a hypertext transport protocol (HTTP)-based web server, like NETSCAPE ENTERPRISE SERVER 2.0 or the APACHE web server, to receive and respond to requests for data from the other computer systems 106, 108.

*Williamson* patent col. 5, ll. 40–47. The *Williamson* patent further disclosed that

> the DLCM 310 preferably includes software written in JAVASCRIPT and C++ providing auto-sensing capabilities for verifying that the participants' computer systems 106, 108 meet the hardware and software requirements for participating in the distributed learning session. For example, the auto-sensing capabilities determine whether the participants' computer systems 106, 108 support the correct display settings, browser and JAVA versions, and needed bandwidth. Moreover, the DLCM 310 software preferably provides the participants' computer systems 106, 108 with the instructions for creating the properly-sized program windows and controls the content displayed therein. The DLCM 310 also includes authentication services for providing security to the participants and provides a presenter with streaming media selection function-

ality to enable configuring streaming media networks in an ad hoc fashion.

*Williamson* patent col. 5, ll. 48–64. Additionally, the *Williamson* patent describes in substantial detail, the "interconnections and intercommunications" that exist between the "distributed learning control module" and the other components of the invention. *See Williamson,* 770 F.3d at 1380; *Williamson* patent col. 2, ll. 20–33, col. 6, ll. 54–58, col. 7, ll. 1–5, 20–24, col. 11, ll. 26–61. In other words, the intrinsic evidence not only reinforced the functions to be performed by the "distributed learning control module," it also explained how those functions were accomplished. *See Bosch,* 769 F.3d at 1100 (applying means-plus-function to the term "program loading device" in part because "the specification is again silent about *how* the 'program loading device' receives and processes signals" (emphasis added)). Accordingly, the Court of Appeals in *Williamson* found that although "the supporting specification describes the claimed expression 'distributed learning control module' in a high degree of generality, in some respects using functional expressions, it is difficult to conclude that it is devoid of structure." *Williamson,* 770 F.3d at 1380.

In stark contrast, the '849 patent specification discloses no recognizable structure for the term "proficiency sensing module." The specification makes clear, and Guitar Apprentice admits, that the claimed "proficiency sensing module" is software. (ECF No. 53 at 9; *see* '849 patent col. 3, ll. 58–62.) Therefore, the "proficiency sensing module" does not itself comprise physical structure. The '849 patent specification goes on to explain that "[c]ircuitry and software for such signal reception and processing is presently known to those of skill in the art, and as *particular structure for performing the same is not required* for the media system 10 of the present invention *further description herein may be*

*omitted.*" ('849 patent col. 3, ll. 57–67 (emphasis added).) Ubisoft's expert asserts, and the Court agrees, that based on the above statement, "the specification admittedly fails to describe how any circuitry or 'processor-readable instructions' (i.e., software) perform[ ] the functions of 'receiv[ing] signals,' 'compar[ing] the received signals to expected signals,' and 'determin[ing] a proficiency level of the user based on the comparison.'" (ECF No. 28–6 ¶ 42 (alterations in the original).) The sentiment that the drafter of the '849 patent felt no need to include particular structure and omitted such structure in the specification is reinforced by the only other passage in the specification that uses the term "proficiency sensing module." That passage explains that "a person having ordinary skill in the art of software programming would conceive of numerous structural means for producing the same executable results" in order to perform the functions required of the various claimed modules, including the "proficiency sensing module." ('849 patent col. 3, ll. 19–28.)

Guitar Apprentice further asserts that sufficient structure exists to avoid § 112(f) claim construction because the claim limitation "'program module' is tangibly embodied on a non-transitory computer-readable medium, is executable by a processor, and should be considered as directly analogous if not interchangeable with respect to the terms 'software' and 'instructions.'" (ECF No. 29 at 28.) The Federal Circuit, however, has made clear that merely claiming a general purpose computer to execute software is insufficient to avoid a means-plus-function construction of a purely software limitation. *Apple,* 757 F.3d at 1298 ("Indeed, the typical physical structure that implements software, a computer, cannot be relied upon to provide sufficiently definite structure for a software claim lacking 'means.' Rather, to one of skill in the art, the 'structure' of computer software is understood through,

for example, an outline of an algorithm, a flowchart, or a specific set of instructions or rules.") Additionally, merely claiming the generic components of a computer, rather than expressly claiming a general purpose computer, does not alter the analysis. *See HTC Corp. v. IPCom GmbH & Co., KG,* 667 F.3d 1270, 1280 (Fed.Cir. 2012) ("The district court misstated the law, however, when it stated that disclosure of a processor and transceiver alone was sufficient to provide structure to these claims. The processor and transceiver amount to nothing more than a general-purpose computer."); *cf. Ergo Licensing, LLC v. CareFusion 303, Inc.,* 673 F.3d 1361, 1364 (Fed.Cir.2012) ("The specification discloses that the control device has memory, but memory is not structure capable of performing the function of 'controlling the adjusting means.'") Consequently, disclosure of a processor and non-transitory processor-readable memory medium in claim 9 does not provide sufficient structure to avoid § 112(f).

Because a plain reading of the specification and claims fails to disclose sufficient structure to avoid means-plus-function analysis, the Court looks to extrinsic evidence to determine whether the term "proficiency sensing module" "is used in common parlance or by persons of skill in the pertinent art to designate structure...." *See Flo Healthcare,* 697 F.3d at 1374. In *Teva Pharmaceuticals,* the Supreme Court recently held that where extrinsic evidence is sought in order to construe a patent claim and "subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." 135 S.Ct. at 841. In the present case, the Court looks to two types of extrinsic evidence to construe the claim limitation "proficiency sensing module"—dictionary definitions and expert testimony.

In *Williamson,* the Court of Appeals found that "the word 'module' has understood dictionary meanings as connoting either hardware or software structure to those skilled in the computer arts." 770 F.3d at 1379. The Court of Appeals *sua sponte* consulted multiple dictionaries and found persuasive certain dictionary definitions of "module":

The IBM Corporation, *IBM Dictionary of Computing* 439 (1st ed.1994) defines "module" as a "packaged functional hardware unit designed for use with other components" and a "part of a program that usually performs a particular function of related functions." *See also* Alan Freedman, *The Computer Glossary* 268 (8th ed.1998) (defining "module" as a "self-contained hardware or software component that interfaces with a larger system"); John Daintith & Edmund Wright, *Dictionary of Computing* 315 (4th ed.1996) (defining "module" as a "programming or specification construct that defines a software component" and a "component of a hardware system that can be subdivided").

*Williamson,* 770 F.3d at 1379. Ubisoft and its expert have provided a similar definition relevant to the '849 patent claims:

To a software developer or one skilled in the art of interactive software, a module generally means a stand-alone piece of software that may be part of a larger system.

(ECF No. 50–3 at 11:19–21.) In evaluating the term "module" in the context of the claim limitation "proficiency sensing module," Mr. Kitchen went on to explain that "[module] doesn't convey any structure beyond its software." (ECF No. 50–3 at 11:22.) In Mr. Kitchen's opinion, "the term 'module' is merely a generic term that does not convey any particular structure to one of ordinary skill in the art in the context of computer software or engineering."

As discussed previously, the facts of the instant case differ in significant respects from the facts of the *Williamson* case. In *Williamson,* the dictionary definitions connoted structure in light of the structural intrinsic evidence that existed in the *Williamson* patent. No such intrinsic evidence of structure exists in the '849 patent. Rather, the express language of the '849 patent specification disavows the existence of particular structure in the specification. Notwithstanding the factual findings in *Williamson,* the Court makes the factual finding in the present case that the term "module" as it relates to the claim limitation "proficiency sensing module" as disclosed in the '849 patent does not by itself connote structure to one of ordinary skill in the relevant art. This finding is compelled by the expert evidence proffered in the present case and the relevant dictionary definitions considered by the Court, including those considered *sua sponte* by the *Williamson* panel.

Moreover, the *Williamson* panel criticized the district court's "fail[ure] to consider the claimed expression 'distributed learning control module' as a whole." 770 F.3d at 1379–80. In the present case, significant extrinsic evidence has been submitted with regards to the construction of "proficiency sensing module" as a singular integrated term. In his expert report, Mr. Kitchen attests that he is "not aware of any general or technical dictionaries or any known industry definitions for the term 'proficiency sensing module.'" (ECF No. 28–3 ¶ 38.) Neither has Guitar Apprentice submitted any dictionary definition to the contrary. At the claim construction hearing, Mr. Kitchen further testified that "proficiency sensing module" is not a term of art. (ECF No. 503 at 12: 1–2.) Mr. Kitchen stated that there would

be a general understanding of the meaning of "proficiency sensing module" in the industry, but not an understanding strong enough to know what it is without having more information," and nothing beyond the "common English language [meaning of] 'sensing proficiency.'" (ECF No. 50–3 12:3–14.) Mr. Kitchen also expressed his opinion that the claim language is purely functional and "doesn't define 'proficiency sensing module' from a software or engineering standpoint." (ECF No. 50–3 at 12:19–13:2.)

Looking to the specification, Mr. Kitchen stated that no structure existed for 1) reading signals from a guitar (ECF No. 50–3 at 15:4–11), 2) comparing signals received from the guitar to expected signals (ECF No. 50–3 at 15:22–16:1), and 3) determining a proficiency level of a user (ECF No. 50–3 at 16:210). Mr. Kitchen further asserted that a person of ordinary skill in the art would not be able to determine what the executable result of performing the functions related to the "proficiency sensing module" would be. (ECF No. 50–3 at 16:2517:7.) Mr. Kitchen concludes that "there is no way ... that two or more different engineers, having ordinary skill in the art of software programming, could conceive of structural means that would produce the same executable result, as stated in the '849 patent." (ECF No. 28–6 ¶ 46.) In Mr. Kitchen's opinion, without further disclosure, the claim limitation "proficiency sensing module" has "no meaning to one skilled in the art attempting to build the invention disclosed in the '849 patent." (ECF No. 28–6 ¶ 46.)

Mr. Kitchen's testimony is persuasive. The claim limitation "proficiency sensing module" is so devoid of structure that not only would a person of ordinary skill in the art not be able to produce the same executable result as another person of ordinary skill in the art, but one of ordinary skill in the art is unable to ascertain what the executable result of the "proficiency sensing module" should be. Accordingly, the Court makes factual findings that the claim limitation "proficiency sensing module" is not used "by persons of skill in the pertinent art to designate structure," nor is it "common parlance" in the software industry. *See Flo Healthcare,* 697 F.3d at 1374 (Fed.Cir.2012). The Court makes the additional factual finding that the extrinsic evidence relevant to the claim limitation "proficiency sensing module" strongly supports the conclusion that the '849 patent fails to disclose sufficient structure to avoid construction under § 112(f).

Under *Williamson,* the argument may also be made that the modifiers "proficiency sensing," by themselves provide sufficient structure to the term "module" to avoid § 112(f). *See* 770 F.3d at 1380 (finding the modifiers "distributed learning control" were evidence of structure for the claim limitation "distributed learning control module" because the terms "narrow the scope of the expression as a whole"). The Court finds this argument to be unavailing in the present case for the reason that, unlike in the *Williamson* patent, no structure is disclosed in the '849 patent to connote to one of ordinary skill in the art how to perform proficiency sensing. In the instant case, the adjectival modifiers "proficiency sensing" merely recite the primary function of the module, rather than provide structure to "narrow the scope of the expression as a whole." *See id.*

In sum, the claims and specification of the '849 patent do not disclose structure relevant to the claim limitation "proficiency sensing module." Similarly, the relevant extrinsic evidence strongly supports the conclusion that "proficiency sensing module" fails to connote structure to one of ordinary skill in the art. Accordingly, the Court finds that Defendant Ubisoft has

met its burden in showing that the claim limitation "proficiency sensing module" falls within § 112(f) and must be construed as a means-plus-function limitation.

**b) Construction Under § 112(f)**

Once the Court has determined means-plus-function applies, the Court first identifies the function of the limitation, and secondly identifies the corresponding structure in the specification to construe the limitation. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed.Cir.2007). Moreover, "[i]f there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite." *Bosch*, 769 F.3d at 1101 (quoting *Biomedino*, 490 F.3d at 950). A finding of "indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *In re Aoyama*, 656 F.3d 1293, 1299 (Fed.Cir.2011) (internal quotation marks and citations omitted).

In the present case, Ubisoft argues that "the specification of the '849 patent does not disclose structure associated to the function recited in the 'proficiency sensing module' limitation, rendering claim 9 indefinite." Ubisoft asserts that claim 9 discloses three functions for "proficiency sensing module": "receiv[ing] signals from a guitar electrically coupled to the system, compar[ing] the received signals to expected signals associated with corresponding user segments of the musical performance, and determin[ing] a proficiency level of the user based on the comparison." (ECF No. 28 at 18 (quoting '849 patent col. 10, ll. 40–45) (alterations in the original).) According to Ubisoft, "[l]anguage such as 'for' generally signals a claimed function." (ECF No. 28 at 18.) Ubisoft asserts that the language in claim 9 "effective to" signals the claimed functions for "proficiency sensing module." (ECF No. 28 at 18; *see* '849 patent col. 10, ll. 40–45.) Because

"[t]he '849 patent does not disclose any structure, flow chart, process or algorithm that performs the recited function[s] of the 'proficiency sensing module,'" Ubisoft argues, the '849 patent specification "provides no corresponding structure, [and] claim 9 is invalid for indefiniteness." (*See* ECF No. 28 at 20–21.)

Guitar Apprentice argues that the claim limitation "proficiency sensing module" is not a means-plus-function term. Guitar Apprentice further argues in the alternative that should the Court apply a means-plus-function construction, the claim limitation is not indefinite because "the recitation of the [claim] steps alone amounts to more than sufficient disclosure of an algorithm performed by the software modules." (ECF No. 32 at 21.) Accordingly, Guitar Apprentice submits that the activities identified by Ubisoft as the claim limitation functions are actually the corresponding structure for "proficiency sensing module." (*See* ECF No. 32 at 15–16.)

**(1) Limitation Function**

The first step in construing a means-plus-function claim limitation is "to determine the claimed function." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed.Cir.2012). In determining the function for a means-plus-function limitation, it is generally improper to read unclaimed limitations into the function. *See JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330–31 (Fed.Cir. 2005). Therefore, "a court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.'" *Id.* (quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed.Cir. 1999)).

The Court agrees with Ubisoft that the claimed functions are disclosed in the claim limitation's surrounding claim language. Claim 9 recites

a proficiency sensing module effective to receive signals from a guitar electrically coupled to the system, compare the received signals to expected signals associated with corresponding user segments of the musical performance, and determine a proficiency level of the user based on the comparison

('849 patent col. 10, ll. 40–45.) As discussed in the previous section, the language following "effective to" is functional. Supra Part III.D.1.a. This language does not disclose an algorithm, rather, it merely recites the "proficiency sensing module's" functions. *See id.* Consequently, the Court finds that the language "effective to" is an indicator of the claimed functions that follow. Accordingly, the Court identifies the same functions for "proficiency sensing module" as those identified by Ubisoft:

1) receiving signals from a guitar electrically coupled to the system;

2) comparing the received signals to expected signals associated with corresponding user segments of the musical performance; and

3) determining a proficiency level of the user based on the comparison.

### (2) Corresponding Structure

 In the second step of means-plus-function claim construction, "the court must identify the corresponding structure in the written description of the patent that performs the function." *Noah Systems,* 675 F.3d at 1311. A patent's "specification must contain sufficient descriptive text by which a person of skill in the field of the invention would know and understand what structure corresponds to the means limitation." *Function Media, L.L.C. v. Google, Inc.,* 708 F.3d 1310, 1317 (Fed.Cir.2013) (internal quotation marks and citations omitted). "If the specification is not clear as to the structure that the patentee intends to correspond to the

claimed function, then the patentee ... is attempting to claim in functional terms unbounded by any reference to structure in the specification." *Biomedino,* 490 F.3d at 948. When construing computer-implemented means-plus-function terms, disclosure of a general purpose computer or its generic components "amounts to pure functional claiming." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.,* 521 F.3d 1328, 1333 (Fed.Cir.2008); *see HTC,* 667 F.3d at 1280; *Ergo Licensing,* 673 F.3d at 1364. For a means-plus-function software claim limitation executable on a general purpose computer to avoid a finding of indefiniteness, the patent's specification must disclose "an algorithm 'in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.'" *TecSec, Inc. v. Int'l Bus. Machines Corp.,* 731 F.3d 1336, 1348 (Fed.Cir.2013) *cert. denied sub nom. Cisco Sys., Inc. v. TecSec, Inc.,* —— U.S. ——, 134 S.Ct. 2698, 189 L.Ed.2d 756 (2014) (quoting *Finisar Corp. v. DirecTV Grp., Inc.,* 523 F.3d 1323, 1340 (Fed.Cir. 2008)); *Harris Corp. v. Ericsson Inc.,* 417 F.3d 1241, 1253 (Fed.Cir.2005) ("*WMS Gaming* [*v. Int'l Game Tech.,* 184 F.3d 1339 (Fed.Cir.1999) ] restricts computer-implemented means-plus-function terms to the algorithm disclosed in the specification."). "[S]imply reciting 'software' without providing some detail about the means to accomplish the function is not enough." *TecSec,* 731 F.3d at 1348–49 (internal quotation marks and citations omitted). "The party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *Id.* at 1349 (quoting *Budde v. Harley–Davidson, Inc.,* 250 F.3d 1369, 1380–81 (Fed.Cir.2001)).

 The '849 patent specification discloses no algorithm or computer code cor-

responding to any of the three claimed functions. The disclosure that most approximates an algorithm, as pointed out by Guitar Apprentice, is the functional language of claim 9. This disclosure, however, fails as corresponding structure. Lack of corresponding structure is further evidenced by the express language of the '849 patent specification, which rather than disclose "particular structure," asserted that "a person having ordinary skill in the art of software programming would conceive of numerous structural means for producing the same executable results" for the claimed functions. (*See* '849 patent col. 3, ll. 18–28, 57–67.) The Court has already found that one of ordinary skill in the art could not produce the same executable results for the claimed functions or identify any structure related to the "proficiency sensing module" in the '849 patent specification. *See supra* part III.D.1.a. The Court arrives at the same conclusion under the corresponding structure prong of the means-plus-function analysis based on a lack of disclosure of an appropriate algorithm in any accepted form. Accordingly, the Court finds that the claim limitation "proficiency sensing modules" is indefinite as claimed in the '849 patent.

### 2. The "mode control module" Limitation

#### a) Means–Plus–Function Format

With regard to whether "mode control module" should be construed as a means-plus-function claim limitation, the parties generally assert the same arguments made for "proficiency sensing module." Additionally, Ubisoft asserts that

> [t]he term "mode control" is mentioned only twice in the '849 patent specification, and is specifically described as a "structural means" for performing "the functions." '849 patent 3:19–28, 7:44–50. But the specification fails to describe any such "structural means," instead stating only that "a person having ordinary skill in the art of software programming would conceive of numerous structural means for producing the same executable result." *Id.* at 3:19–28; Ex. F (Mr. Kitchen Dec. ¶ 57).

(ECF No. 28 at 22.)

Ubisoft further contends that the '849 patent claims and specification disclose contradictory functions for the claim limitation "mode control module." According to Ubisoft,

> Claim 9 recites: "a mode control module effective to define one or more plurality of musical segments ... as user segments based upon one or more criteria including the determined proficiency level of the user and a performance iteration," and "in successive iterations ... determine whether the proficiency level of the user warrants increasing the number of user segments."

(ECF No. 28 at 22–23.) Relying on expert testimony from Mr. Kitchen, Ubisoft asserts that the specification discloses the functions of "designating one of two operating modes—(1) simulating sounds of the user-selected instrument during host segments and user segments, and (2) muting the sounds of the user-selected instrument during user segments." (*Id.* at 23 (internal quotation marks omitted).) Therefore, according to Ubisoft, "one of ordinary skill in the art cannot identify any structural definition that performs the function of 'mode control module' based on the disclosure of the '849 patent." (*Id.*)

Guitar Apprentice argues that like "proficiency sensing module," "the '849 Patent Specification leaves little doubt that the term 'mode control module' refers explicitly to software," and should not be construed under § 112(f). (ECF No. 29 at 24.) Guitar Apprentice further argues that similar to the "distributed learning control module" at issue in *Williamson*,

[t]he "mode control module" is also claimed as part of the "media system" and "processor-readable memory medium," and "define[s] one or more musical segments" in a musical performance stored in the media system "as user segments based upon one or more criteria" including the proficiency level determined by the proficiency sensing module.

(ECF No. 50 at 8.) According to Guitar Apprentice, the Court in the instant case should reach the same conclusion that the Court of Appeals reached in *Williamson*, that the claim limitation "mode control module" should not be construed under § 112(f). (ECF No. 53 at 10–11.)

Similar to "proficiency sensing module," the claim language surrounding "mode control module" defines the function of the claim limitation. Although not written in clear language, the Court finds two functions exist as to the mode control module: 1) "define one or more of the plurality of musical segments in the selected performance as user segments based upon one or more criteria including the determined proficiency level of the user and a performance iteration"; and 2) determine in successive iterations "whether the proficiency level of the user warrants increasing the number of user segments." ('849 patent col. 10, ll. 46–53.) Unlike "proficiency sensing module," though, the claim language does provide insight into how the "mode control module" defines user segments by disclosing that the definition of user segments is based on certain criteria which include the determined proficiency level and performance iteration. (*See id.*)

The '849 patent specification also provides some amount of structure to the claim limitation. In one embodiment, the specification teaches that the "mode control module" "designate[s] an operating mode with respect to predetermined seg-

ments of the musical performance, such that generally host segments are associated with a first mode of operation and user segments are associated with a second mode of operation." ('849 patent col. 7, ll. 46–50.) Although the specification describes the functionality of "mode control module" in terms of two operating modes, it is readily apparent to the Court that the specification, like the claim language, is describing how the "mode control module" carries out the function of defining user segments for a particular iteration. (*See id.* col. 7, 44–50.) Accordingly, the Court rejects Ubisoft's argument that the specification contradicts the claimed functions. Moreover, the '849 patent specification's disclosure of designating two operating modes provides some limited structure regarding how the claimed functions are performed.

Similar to the '849 patent specifications disclosure of "proficiency sensing module," the specification also states with regards to "mode control module" that "a person having ordinary skill in the art of software programming would conceive of numerous structural means for producing the same executable results." (849 patent col. 3, ll. 19–28.) Unlike "proficiency sensing module," however, the specification does not state that it has omitted further disclosure of particular structure in the form of circuitry and software with regards to "mode control module." (*See* '849 patent col. 3, ll. 54–67.)

Looking to the extrinsic evidence, Ubisoft's expert Mr. Kitchen has asserted that "mode control module" "does not convey sufficiently definite structure to a person of ordinary skill in the art." (ECF No. 28–6 ¶ 51.) Mr. Kitchen states that there are no dictionary definitions for "mode control module" and that "performing 'mode control' is not an ordinary skill, is not generally known in the art, and does

not have a well-known meaning to those of skill in software programming." (*Id.* ¶ 54.) Mr. Kitchen further states his opinion that neither the claim language nor the specification provides structure to the claim limitation "mode control module." (*Id.* ¶¶ 51, 55–56.) Guitar Apprentice has presented no expert testimony regarding the construction of "mode control module."

As previously explained, the Court disagrees with Mr. Kitchen's conclusion that the claim language and specification fail to disclose any structure. In addition to reasons already discussed, Mr. Kitchen's expert report reveals that certain structure is connoted to one of ordinary skill in the art. Mr. Kitchen states that in the first operating mode as described in the '849 patent specification, the "mode control module" "simulat[es] sounds of the user-selected instrument during host segments," and "mut[es] the sounds of the user-selected instrument during user segments" in the second operating mode. (ECF No. 28–6 ¶ 58.) In the same paragraph, Mr. Kitchen further points out that according to the specification, "[the] first mode of operation for the system" is further defined by "the generating of signals during the host segments." (*Id.* (citing '849 patent col. 7, ll. 20–37).) Similarly, "[t]he adjustment made" by "mut[ing] the predetermined instrument during the user segments" may define the second mode of operation. (*Id.*) Mr. Kitchen concludes that these two operational modes are unrelated to the claimed functions for the "mode control module." (*Id.* at ¶ 58.) Although not entirely relevant to defining user segments or determining whether to increase user segments in a subsequent iteration, the description of the two modes and how those modes result in the simulation of some segments and the muting of other segments, provides at least a modicum of structure to the claimed limitations.

Disclosure of certain criteria by which the system defines user segments, disclosure of an embodiment where the system achieves the functional goals by separating the musical performance into two operational modes, disclosure of how the end result of the simulation of certain host segments is achieved, in conjunction with existing definitions of the term "module" may be only weak evidence of particular structure associated with "mode control module." It is, however, "difficult to conclude that [the '849 patent] is devoid of structure" associated with the claim limitation "mode control module." *See Williamson*, 770 F.3d at 1380. Accordingly, the Court finds that "mode control module" does not fall within the ambit of § 112(f).

### b) "Mode Control Module" Construction

Once the court has determined that a term is not a means-plus-function claim limitation, the normal rules of claim construction apply. Guitar Apprentice asserts that the proper construction of "mode control module" is "computer program instructions executable by a processor to provide mode control." (ECF No. 29 at 24.) Guitar Apprentice supports its proposed construction stating that "the '849 Patent Specification leaves little doubt that the term 'mode control module' refers explicitly to software." (*Id.* (citing '849 patent col. 7, ll. 44–48).) Ubisoft does not submit an alternative construction beyond its indefiniteness argument.

▇▇ The Court agrees with Guitar Apprentice that, in light of the surrounding claim language and relevant statements in the specification, "mode control module" refers to software executable by a processor. (*See* '849 patent col. 2, ll. 42–46, col. 3, ll. 12–31, col. 10, l. 14.) Accordingly, the Court adopts Guitar Apprentice's construction for "mode control module": com-

puter program instructions executable by a processor to provide mode control. The Court notes that in construing "mode control module," the Court does not make a final determination as to the validity of this claim limitation.

## IV. CONCLUSION

For the foregoing reasons, the Court construes the following terms: